IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JACOB BARRETT,

                    Plaintiff,

      v.

JEFF PREMO, MICHELLE
DODSON, JANE DOE, COLETTE
PETERS, KELLY RATHS,

                Defendants.

No. 6:11-CV-06358-HZ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Blerina Kotori
William F. Martson, Jr.
TONKON TORP LLP
1600 Pioneer Tower
888 SW Fifth Avenue Suite 1600
Portland, OR 97204

        Attorneys for Plaintiff

Shannon Vincent
OREGON DEPARTMENT OF JUSTICE
Trial Division, CLS
1162 Court Street, NE
Salem, OR 97301

        Attorney for Defendants

1- FINDINGS OF FACT AND CONCLUSIONS OF LAW

HERNÁNDEZ, District Judge:

This case concerns the constitutionality of the Oregon Department of Corrections' decision to reject an incoming piece of mail because it had artwork on the front of the envelope. Plaintiff Jacob Barrett, an Oregon Department of Corrections (ODOC) inmate, brings a claim for relief under 42 U.S.C. § 1983, which provides a cause of action against state and local governments and their officials for violations of a person's federal constitutional and statutory rights. Plaintiff brings this claim against Jeff Premo, Superintendent of the Oregon State Penitentiary (OSP); Michelle Dodson, former Executive Assistant to Superintendent Premo; Jane Doe[1]; Colette Peters, Director of ODOC; and Kelly Raths, Administrator of the Office of Inmate and Community Advocacy at ODOC; (collectively, "Defendants"). Plaintiff alleges that Defendants violated his First Amendment rights by rejecting and returning a letter that Plaintiff sent to an inmate at OSP because of a picture Plaintiff had drawn on the front of the envelope.

This Court conducted a one-day bench trial on February 19, 2015. These are the Court's Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52 (a)(1). As explained below, Defendants violated Plaintiff's First Amendment rights. As a result, Plaintiff is awarded declaratory and injunctive relief.

## FINDINGS OF FACT

I.      Rejection of Plaintiff's Letter

Pursuant to the Interstate Corrections Compact, Plaintiff was housed in New Mexico at the time of the incident at issue and is currently housed in Florida. Stipulation of Admitted Facts,

---

[1] While Jane Doe is a named defendant, the parties' Pre-Trial Order does not mention Doe. [66]. Based on the parties' order and the absence of any mention of Doe at trial, the Court construes Plaintiff's position as having voluntarily dismissed Doe from the action. See Hunt v. Cnty. of Orange, 672 F.3d 606, 617 (9th Cir. 2012) (explaining that a district court was within its power to *sua sponte* dismiss a defendant who was not included in the pretrial order).

at 1, [171]. The Oregon Administrative Rules governing incoming inmate mail apply to Plaintiff

to the extent he sends mail to inmates in ODOC custody.

In approximately January of 2011, Plaintiff sent a letter to his cousin, Christopher

Weedmark, an ODOC inmate who was housed at OSP. Plaintiff's letter to Mr. Weedmark was

inside an envelope. On the front of the envelope, Plaintiff had drawn a picture of three skulls,

dice, and barbed wire. Pl.'s Ex. 3. Plaintiff's envelope was rejected by mailroom staff at OSP

and returned to him, unopened, with a note on the front of the envelope stating "no writing on

front of envelope" and a checkmark next to a box indicating "violates inmate mail rule." Id.

On or about February 2, 2011, Plaintiff wrote a letter to OSP's Mailroom Administrator

seeking administrative review of the mail violation. Pl.'s Ex. 4. On February 24, 2011,

Superintendent Premo responded to Plaintiff's request for administrative review. Pl.'s Ex. 5.

Superintendent Premo stated that "the letter was returned to you due to art work being on the

envelope," and that "in accordance with [OAR 291-131-0025][2], incoming mail will be denied

and returned to sender if that mail contains anything other than postage, the sender's name and

return address, and the addressed inmate's name, SID number and address." Id.

On March 8, 2011, Plaintiff sent a letter to OSP's Grievance Coordinator, requesting a

reversal of Superintendent Premo's decision. Pl.'s Ex. 6. On March 16, 2011, Michelle Dodson,

in her role as the Grievance Coordinator's supervisor, responded to Plaintiff in a letter. Pl.'s Ex.

7. Ms. Dodson cited Oregon Administrative Rule 291-131-0037, Disposition of Prohibited Mail:

> No administrative review shall be available if the rejection is based on the presence of an
> unauthorized attachment, substance or enclosure on or with the mail, or if the rejection is
> based on any violation not related to the written or pictorial content.

---

[2] Superintendent Premo's letter cited "Oregon Revised Statute, 291-131-0025." Pl.'s Ex. 5.
However, it is clear from the record that this was a typographical error and that he intended to
cite Oregon Administrative Rule 291-131-0025.

Id. Ms. Dodson further stated that Plaintiff was "not eligible for any further review on this issue." Id. Plaintiff filed a Tort Claim Notice on April 8, 2011. Pl.'s Ex. 8. Plaintiff filed the present lawsuit on November 10, 2011. Complaint, [2].

In September 2014, during the pendency of this lawsuit, Plaintiff sent letters to four ODOC inmates housed in three different ODOC facilities.[3] Each letter was enclosed in an envelope with a drawing of a "tribal turtle"[4] on the outside. Pl.'s Ex. 10. The letters were delivered to the inmates as addressed. Stipulation of Admitted Facts at 5, [171]. None of the "turtle envelopes" were rejected, despite having artwork on the front of the envelope.

II.    Plaintiff's Testimony

At trial, Plaintiff testified that he has been incarcerated for approximately 21 years. He stated that he has drawn consistently on envelopes since approximately 1996 or 1997, and that this was the first time one of his envelopes had been rejected by ODOC. Plaintiff testified that he did not know that drawings were not allowed on the front of envelopes until his envelope was rejected in early 2011. Plaintiff testified that his drawing of skulls, dice, and barbed wire did not contain any code or promote criminal activity.

Plaintiff testified that he draws as much as possible, sometimes even for hours in a day. He said that drawing has changed his life because it is a way he can express his emotions. He testified that it has a positive impact on his relationships, including with other inmates, because he can inspire people and lift their spirits with his artwork. He also testified that being able to draw could help with his rehabilitation if he is released from prison. Plaintiff testified that few

---

[3] Plaintiff prepared the letters and envelopes and had his attorney mail them.
[4] Plaintiff refers to the drawing as a "tribal turtle." The drawing is a simple, hand-drawn, black and white depiction of a turtle. Pl.'s Ex. 10.

inmates draw consistently. He estimated that within OSP, approximately 5-10 inmates draw. He did not know how many of those inmates draw on envelopes.

Plaintiff testified that inmates have very limited access to resources to draw in prison. He testified that being able to draw on the front of envelopes was important because it was a completely flat surface, as opposed to the back of an envelope, and it did not take up space on the paper enclosed in the envelope. In addition, Plaintiff explained that ODOC often puts an address label on the back of envelopes; therefore, if Plaintiff drew on the back, his artwork may be covered by a label. Plaintiff also testified that indigent inmates only receive two pieces of paper and five envelopes per month. Therefore, every inch of space is a valuable resource. Finally, Plaintiff testified that the front of envelopes was a specific medium for him to express himself, similar to any artist who chooses a preferred medium for expression.

III.    Mail Processing within the Oregon Department of Corrections

ODOC strives to deliver incoming inmate mail within 48 hours of its arrival at the prison. At OSP, where Plaintiff sent the letter to his cousin, there are four full-time staff in the mailroom who are responsible for, among other things, processing incoming mail. In addition, there are often up to three additional staff members assigned temporarily to assist in the mailroom. The OSP mailroom staff processes an average of 800-1200 pieces of incoming mail per day. Defs.' Ex. 504.

ODOC mailroom staff members go through various steps to process each piece of incoming mail. First, the mail is inspected for technical violations on the exterior of the envelope. If there are no technical violations, the incoming mail's SID[5] number must be verified against the inmate's name. The staff member looks up the SID number in a computer program to

_____

[5] Each inmate is assigned a state offender identification (SID) number.

determine where the inmate is located and then writes the inmate's housing unit and bunk on the front of the envelope. Then, the staff member opens each piece of mail and searches its contents. Finally, the staff member places the envelope in a bin for distribution to the housing units. All mail is delivered by other ODOC employees. No inmate ever handles, sorts, or distributes mail.

If a mailroom staff member finds a technical violation, the mail is returned to the sender with a sticker, stamp, or handwritten notation, indicating the cause of the violation. Staff members refer to this process as "violating" an envelope. At trial, witness testimony varied as to how long it takes to violate an envelope. Kelly Raths, Administrator of the Office of Inmate and Community Advocacy at ODOC, testified that it takes about 5 minutes; Chris Toombs, OSP Mailroom Lead Worker, testified that it takes between 15 and 30 seconds; and Brandon Kelley, Assistant Superintendent of Security at OSP, testified that it takes 20 seconds.

ODOC does not track how many envelopes are violated per day, nor does it track how many envelopes are violated because they have artwork on the front. Mr. Toombs estimated that 25-100 envelopes are violated out of the approximately 1200 pieces of mail that OSP receives per day. Mr. Toombs did not know how many were violated due to artwork, as opposed to other technical violations.

In addition to first class mail, mailroom staff members process books, magazines, legal mail, inmate emails, video visits (similar to skype), electronic photo uploading services, and a service similar to text messages.

IV.    Oregon Department of Corrections' Incoming Mail Rule

Oregon Administrative Rule 291-131-0025 states, in relevant part:

Incoming Mail: (1) Incoming mail shall require the sender's name and return address on the front of the envelope and shall be addressed to the inmate using only his/her committed name and SID number.

Pl.'s Ex. 1 at 6. The plain language of the incoming mail rule does not ban artwork on the front of envelopes. The rule only addresses what the front of envelope must include, not what it must exclude.

Every ODOC witness testified that this was the only rule at issue in this case and the only rule that purportedly establishes a *de facto* ODOC policy of prohibiting artwork on the front of envelopes. Plaintiff testified that he was unaware of this OAR until his letter was returned to him.

Ms. Raths testified that, among other job duties, she fills the role of "central mail administrator" and that one of her responsibilities is to oversee the mail rules, including how they are applied and interpreted. Ms. Raths testified that OAR 291-131-0025 does not clearly state that artwork is prohibited on the front of an envelope. She also testified that there is no other ODOC rule or policy that prohibits artwork from the front of envelopes. Ms. Raths explained that, in practice, mailroom staff may interpret the rule to prohibit artwork from the front of envelopes but that the interpretation could vary by facility or staff member.

Ms. Raths stated that in Plaintiff's case, the mailroom staff interpreted the incoming mail rule to indicate that Plaintiff's artwork violated the rule. She was not aware of how frequently envelopes were refused for having drawings on the front, but she stated that a drawing on the front of an envelope would not necessarily lead to an envelope being violated. When asked whether there were any plans within ODOC to adopt a policy or practice to permit artwork on the front of envelopes, Ms. Raths stated that because there was no current policy prohibiting artwork on the front of envelopes, it followed that there were no plans to change any policy.

As to the "turtle envelopes," Ms. Raths testified that she did not know why they were not violated. She hypothesized that, given the volume of mail processed daily, violating the "turtle

envelopes" was a low priority for mailroom staff. Ms. Raths testified that she imagined that most of her mailroom staff would not have concerns with smaller pieces of artwork on an envelope, such as a small image embossed into an envelope for Valentine's Day.

Ms. Raths distinguished the incoming mail rule from ODOC's "Outgoing Mail" rule, which expressly states that "[t]he outside of the envelope shall contain <u>only</u> the inmate's committed name, SID number, and return address, and the addressee's name and address . . . ." <u>See</u> Pl.'s Ex. 1 at 5 (emphasis added). Ms. Raths explained that artwork on the front of envelopes is clearly forbidden in the plain language of the outgoing mail policy but not the incoming mail policy.

On examination by Defendants' attorney, Ms. Raths adjusted her testimony somewhat. She stated that while the incoming mail rule did not explicitly prohibit artwork on the front of envelopes, superintendents throughout ODOC had consistently applied the rule to prohibit artwork on the front of incoming mail. Ms. Raths further stated that, in her role as Administrator of the Office of Inmate and Community Advocacy, she deferred to the superintendents' interpretation of the rule and that she had never heard of any superintendents interpreting the rule differently. Ms. Raths testified that in the 10 months she has been working in her current position at ODOC, this was the only case she had been confronted with regarding the violation of an envelope with a drawing on the front.

Mr. Toombs, OSP Mailroom Lead Worker, testified that it is part of his job duties to be aware of and familiar with the ODOC mail rules. He also stated that it is his job to apply those rules to the processing of inmate mail. Mr. Toombs testified that an incoming envelope with artwork on the front will be violated. He explained that in 2011, the then-supervisor of the mailroom instructed mailroom staff to violate mail with excessive writing, drawings, and stickers

on the front of envelopes because it was causing difficulties for mailroom staff members trying to read the inmates' SID numbers. Mr. Toombs testified that artwork on the back of envelopes has been permitted since 2011. Mr. Toombs also testified that he derived his understanding that artwork is not allowed on the front of envelopes from OAR 291-131-0025. When asked whether he relied on any other source in his understanding, he said he did not.

Mr. Toombs estimated that, as part of his job, in the 3-4 days before trial he had rejected 20-30 envelopes with drawings on them.[6] Mr. Toombs also testified that it was error for a staff member not to violate the "turtle envelopes." Mr. Toombs testified that he was familiar with Plaintiff's name because he mailed information to Plaintiff from the legal library.

Mr. Kelley, Assistant Superintendent of Security at OSP, testified that the incoming mail rule was his only basis for understanding that artwork is not allowed on the front of envelopes. He testified that in his experience at the three ODOC institutions he has supervised, the rule is enforced consistently.

Mr. Kelley testified that the problem with artwork on the front of envelopes is that it distracts mailroom staff members who are on tight timelines to process large volumes of mail. Mr. Kelley explained that staff members must be able to clearly and quickly see the addresses of the sender and recipient. Mr. Kelley testified that if drawings were allowed on the front of envelopes, it would inhibit the ability of mailroom staff members to efficiently do their job, because it would increase the time required to process a letter from approximately 5 to 20 seconds. In addition, Mr. Kelley testified that ODOC staff members need room to write on the envelope if it needs to be rerouted to a different housing area or facility.

---

[6] The trial was held on February 19. Mr. Toombs explained that there were higher than average numbers of envelopes with drawings, doodles, and other forbidden artwork on the days near February 14, Valentine's Day.

9- FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. Kelley also testified that incoming postcards could not have any drawings on them. However, he was unable to point to any rule that supported his assertion. When pressed on cross-examination to identify a rule that prohibits drawings on postcards, Mr. Kelley referred to OAR 291-131-0025(6), which says nothing about drawings or postcards.[7]

Prior to trial, Defendants argued that the ban on artwork on the front of envelopes is needed to promote the goals of security and efficiency. At trial, Defendants' primary argument was based on efficiency. Mailroom staff must sort hundreds of pieces of incoming mail every day and, arguably, it would hurt efficiency to allow drawings on the front of envelopes because it would make it more difficult for staff members to read the recipient's SID number and address. In addition, drawings could interfere with the space on the envelope needed by staff members to write the recipient's bunk number and, potentially, to correct that bunk number if the mail later needed to be rerouted. Defendants argued that security would be impacted as an offshoot of the impact on efficiency. Because staff members would spend more time processing envelopes with drawings on them, they would not be able to spend as much time ensuring that all of the mail was properly screened for security issues.

## CONCLUSIONS OF LAW

To prevail on a § 1983 claim, a plaintiff must prove by a preponderance of evidence (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006) (elements of § 1983 claim); Dias v. Elique,

---

[7] OAR 291-131-0025(6) states: "Inmates may receive catalogs, advertisements, brochures, promotional materials, pamphlets, sweepstakes, and contest materials solicited by the inmate provided the materials are properly addressed with the inmate's full name and SID number and are received directly at the correct address of whether the inmate is currently housed. These materials must conform to any content restrictions contained within this rule." Pl.'s Ex. 1.

436 F.3d 1125, 1129 (9th Cir. 2006) (a plaintiff must prove § 1983 claim by a preponderance of evidence). There is no dispute in this case that Defendants acted under color of state law. Thus, the only question is whether Defendants violated rights secured by the Constitution.

Prisoners have a "First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (citation omitted). A prisoner's First Amendment rights, however, are "subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990) (citations omitted). "Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Turner v. Safley, 482 U.S. 78, 85 (1987) (citation omitted).

I.        No Policy or Practice Prohibiting Artwork from the Front of Envelopes

As an initial matter, the Court finds that, despite Defendants' assertion (which Plaintiff appeared to accept for the purposes of this case), there is no ODOC policy or practice that prohibits artwork on the front of envelopes containing incoming mail for inmates.

Unquestionably, there is no written policy. The plain language of OAR 291-131-0025, the rule that every witness relied on, says nothing about what is prohibited on the front of incoming mail envelopes. Furthermore, Defendants failed to present credible testimony demonstrating the existence of any *de facto* policy or practice.

Ms. Raths' job responsibilities include oversight of the administration and interpretation of the mail rules, yet she testified that no ODOC policy prohibits artwork from the front of envelopes and that the practice of individual mailroom staff members will vary. While she later sought to correct her testimony by stating that all superintendents within ODOC consistently

applied the rule to prohibit artwork on the front of incoming mail, this testimony is not credible in light of her previous candid assertions.

Mr. Toombs presented conflicting testimony as well. On the one hand, he explained that his understanding that artwork is prohibited from the front of envelopes was derived from instructions from the prior mailroom supervisor in 2011. He later stated that OAR 291-131-0025 provided the only basis for his understanding yet, as discussed above, OAR 291-131-0025 says nothing about prohibited content.

Finally, while Mr. Kelley testified that OAR 291-131-0025 is interpreted to forbid artwork on the front of envelopes, his credibility was called into question by his insistence that ODOC also forbids drawing on postcards, an assertion that contradicts Defendants' position earlier in this case and has no support in the OAR Mr. Kelley cited.

On the other hand, Plaintiff credibly testified that he has sent numerous envelopes with artwork on the front during the time he has been incarcerated and has never had an envelope violated, except the one at issue in this case. The "turtle envelopes" add credibility to Plaintiff's testimony and support the conclusion that there is no consistent policy or practice of violating these kinds of envelopes.

Mr. Toombs testified that there was no problem with the content of Plaintiff's drawing, only the location of it on the front of the envelope. Mr. Toombs also testified that he was familiar with Plaintiff's name because Plaintiff requested materials from the legal library to be sent to him. Plaintiff testified that he has filed several lawsuits against ODOC. If mailroom staff knew Plaintiff's name, considered him an adversary of ODOC, and therefore targeted his mail, this would constitute a violation of Plaintiff's First Amendment rights. The Court finds it more likely

that Plaintiff's envelope was violated due to its content—a drawing of barbed wire, three skulls, and dice. This too violates the First Amendment.

The Supreme Court has made clear that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Given that there is neither a policy nor practice that is consistently enforced to prohibit artwork on the front of envelopes of incoming mail, the Court must conclude that Plaintiff's envelope was violated either because of Plaintiff's identity or because of the content of the drawing. Defendants are unable to assert any legitimate policy reason that would justify violating Plaintiff's envelope for either reason.

II.    Turner Factors

While the analysis could end here, the Court nevertheless assumes for the sake of argument that ODOC has a *de facto* policy prohibiting artwork from the front of envelopes. Even granting Defendants this benefit of the doubt, Plaintiff prevails. The Court analyzes the constitutionality of this policy under the Turner factors and concludes that Plaintiff's First Amendment rights were violated.

To determine whether a correctional institution's regulation that "impinges on inmates' constitutional rights" is valid, the court must determine whether that regulation "is reasonably related to legitimate penological interests." Id. at 89. To "guide[ ] courts in determining whether a challenged regulation passes constitutional muster," the Ninth Circuit applies the four-pronged test set forth in Turner. Frost v. Symington, 197 F.3d 348, 354 (9th Cir. 1999). Under this test, courts must determine:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to

13- FINDINGS OF FACT AND CONCLUSIONS OF LAW

exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

Prison Legal News v. Cook, 238 F.3d 1145, 1149 (9th Cir. 2001) (citing Turner, 482 U.S. at 89–90). "The first of these factors constitutes a sine qua non," Walker, 917 F.2d at 385, meaning that "if a regulation is not rationally related to a legitimate and neutral governmental objective, a court need not reach the remaining three factors." Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005).

    a.  Rational Relationship

Under the first Turner factor, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89 (internal quotation marks and citation omitted). This requires the Court to "determine whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc) (quoting Thornburgh v. Abbott, 490 U.S. 401, 414 (1989)).

As discussed in the Findings of Fact, Defendants identified two objectives in enforcing the incoming mail policy: (1) to promote efficiency, and (2) to enhance security. Efficiency and security are legitimate penological objectives. Prison Legal News v. Columbia Cnty., 942 F. Supp. 2d 1068, 1082 (D. Or. 2013) (quoting Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 861 (5th Cir. 2004) ("staff and space limitations, as well as financial burdens, are valid penological interests"), and Abbott, 490 U.S. at 415 (the "legitimacy of the Government's purpose in [protecting prison security] is beyond question")).

Whether a regulation is neutral depends on whether it operates "without regard to the content of the expression." Turner, 482 U.S. at 90. On its face, ODOC's incoming mail policy

14- FINDINGS OF FACT AND CONCLUSIONS OF LAW

does not restrict mail based on content. However, the evidence suggests that, in practice, the application of the policy is content-based. Plaintiff's drawing of skulls, dice, and barbed wire was rejected, while his drawings of turtles on four separate envelopes were not rejected. This suggests that mailroom staff members make decisions as to whether to reject drawings based on their content. Because the entire policy is unwritten and is based on the interpretation of a rule, the Court finds it likely that mailroom staff members' interpretation of the rule's meaning varies.

Witness testimony at trial supports this conclusion. Plaintiff testified that he has sent mail to other inmates with drawings on the front of envelopes for many years and the envelopes have never been rejected. [8] Ms. Raths testified that staff members' interpretation of the policy likely varied and that she imagined that most mailroom staff would not have concerns with a small piece of artwork on an envelope. She also testified that taking the time to violate an envelope with a turtle drawing would probably be a lower priority for mailroom staff members than enforcing other violations of the incoming mail rule.

Even assuming *arguendo* that the policy is applied in a neutral manner, with no restrictions based on content, ODOC fails to show that the policy is rationally related to the objectives of promoting efficiency and enhancing security. A "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89–90. Although the Court must uphold a regulation that bears a rational relationship to a legitimate penological interest, this standard "is not toothless." Abbott, 490 U.S. at 414 (internal quotation marks and citation omitted). "Turner requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." Beard v. Banks, 548 U.S. 521, 535 (2006).

---

[8] Plaintiff also testified that his envelope was rejected as retaliation for his pending lawsuits against ODOC. The Court does not find evidence to support this allegation.

15- FINDINGS OF FACT AND CONCLUSIONS OF LAW

The government may demonstrate a rational relationship by showing "an intuitive, common[-]sense connection" between the prison's policy and its objectives. Frost, 197 F.3d at 356. If the plaintiff does not "present sufficient evidence to refute [that] common-sense connection . . . '[the government] need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future.'" Prison Legal News v. Cook, 238 F.3d 1145, 1150 (9th Cir. 2001) (quoting Mauro, 188 F.3d at 1060). "The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests." Id. If, however, the plaintiff presents sufficient evidence to refute the government's common-sense connection between the regulation and its objectives, the government "must present enough counter-evidence to show that the connection is not so 'remote as to render the policy arbitrary or irrational.'" Frost, 197 F.3d at 357 (quoting Mauro, 188 F.3d at 1060).

With respect to promoting efficiency, Defendants argue that the incoming mail policy saves mailroom staff members time. There is a common-sense connection between the policy and promoting efficiency: If the fronts of envelopes are clear of any extraneous information, then mail room staff members will be able to process the envelopes more quickly and they will be able to deliver them to inmates more efficiently.

However, Plaintiff presented convincing evidence to refute this common-sense connection. The evidence establishes that mailroom staff does not uniformly reject all envelopes with artwork on the front. Therefore, the process of screening envelopes with artwork on them is not a fast, uniform decision requiring no discretion. Instead, the evidence suggests that staff is taking time to determine, based on the content, whether to violate each piece of mail.

16- FINDINGS OF FACT AND CONCLUSIONS OF LAW

Violating a piece of mail takes extra time. It is undisputed that it takes longer to violate a piece of mail than to allow it through. Witnesses testified that it adds anywhere from 20 seconds to 5 minutes of additional time to a staff member's work. Therefore, processing an envelope with a drawing on it that poses no distraction to staff members and does not obstruct the recipient's name or address takes less time than rejecting it. There is no evidence to suggest that, if artwork were allowed on the front of envelopes, all subsequent artwork would be distracting and interfere with staff members' ability to process the mail. The "turtle envelopes" provide an example of how staff members are able to process an envelope with artwork that does not encroach upon the recipient's address.

The question of efficiency boils down to whether, in the absence of a policy banning artwork from the front of envelopes, there would be a significant increase, not just of envelopes with artwork on the front, but envelopes with artwork on the front that caused a distraction or delay in staff members' processing times. The Court finds that it is unlikely that such an increase would result from a change in policy. Alternatively, any increase would be *de minimis*. In Prison Legal News v. Columbia Cnty., 942 F. Supp. 2d 1068, 1084 (D. Or. 2013), the court found that the jail's potential time savings of a few minutes each day by enacting a postcard-only policy was "too small to create a rational connection between the policy and promoting efficiency at the Jail." Similarly here, Defendants have put forward no evidence to support a rational connection between banning artwork on the front of envelopes and increasing efficiency within the prison.

As to security, there is not an intuitive, common-sense connection between banning artwork on the front of envelopes and enhancing prison security. Defendants' security argument is intertwined with their efficiency argument. Defendants contend that, because the policy enhances efficiency, it must also positively impact security because mailroom staff members

17- FINDINGS OF FACT AND CONCLUSIONS OF LAW

have more time to effectively screen mail for security issues. This rationale, however, is only compelling to the extent that the policy increases efficiency. Because the evidence does not establish that it does, Defendants' security argument fails.

No evidence was presented at trial to support the contention that allowing artwork on the front of envelopes would cause security problems. Granted, under Ninth Circuit precedent, Defendants need not prove that there have been past security lapses due to mailroom staff spending time processing envelopes with artwork on the front. See Casey v. Lewis, 4 F.3d 1516, 1521 (9th Cir. 1993). However, the absence of any evidence that artwork on the front of envelopes leads to a security problem or has led to one in the past undermines Defendants' arguments. Mauro, 188 F.3d at 1060 n. 3 ("Although it is not required that prison officials be able to show that the prohibited materials have actually caused problems in the past, ... their ability to do so certainly strengthens their case." (internal citation omitted)). Turner does not give prison officials a "blank check" to restrict constitutional rights. See Johnson v. California, 543 U.S. 499, 547 (2005) (Thomas, J., dissenting).

Furthermore, pursuant to OAR 291-131-0025(11)(B) and all of the witnesses' testimony, "hand-made drawings" may be allowed if they are enclosed in the envelope. Additionally, all of the witnesses testified that artwork is allowed on the back of envelopes. Therefore, any security concern that could arise by allowing artwork on the front of envelopes is refuted by the fact that ODOC allows it in other places. Such an outcome demonstrates that the policy is arbitrary, and is not rationally related to enhancing prison security.

The Court concludes, therefore, that the incoming mail policy fails to satisfy Turner's rational relationship factor. Because "the rational relationship factor is the *sine qua non*," if a policy is not rationally related to a legitimate and neutral governmental objective, a court need

not reach the remaining three factors. Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005); Morrison v. Hall, 261 F.3d 896, 904 (9th Cir. 2001).

Nevertheless, the Court analyzes the remaining Turner factors. Even if the first factor were not dispositive, the remaining three Turner factors either similarly favor Plaintiff or are neutral as to favoring any party. In examining the remaining factors, the Court must bear in mind that the "real task ... is not balancing these factors, but rather determining whether [Defendants] show[ ] more than simply a logical relation" between the incoming mail policy and their legitimate penological goals. Beard, 548 U.S. at 533.

b.   Alternative Avenues

The second factor of the Turner test "is whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90. "In applying this factor, 'the right in question must be viewed sensibly and expansively.'" Mauro, 188 F.3d at 1061 (quoting Abbott, 490 U.S. at 417). Thus, the Supreme Court has upheld a prohibition on inmates' ability to attend the Jumu'ah, a Muslim religious ceremony, because inmates were permitted to participate in other Muslim religious ceremonies. O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). The Supreme Court has also upheld a restrictive prisoner visitation policy in part because "inmates may communicate with persons outside the prison by letter and telephone." Overton v. Bazzetta, 539 U.S. 126, 135 (2003). The Court noted that "[a]lternatives to visitation need not be ideal ...; they need only be available." Id.

Defendants assert that Plaintiff has the alternative means of sending mail with his drawing on the back of the envelope or enclosed in the envelope. Plaintiff testified that, in terms of his self-expression, there is no alternative to sending art on the front of the envelope. He testified that resources are limited for inmates and that this is an avenue in which he may express

19- FINDINGS OF FACT AND CONCLUSIONS OF LAW

himself without using up precious room on paper reserved for letters. He also explained that it is important for his rehabilitation.

In balancing the parties' positions and considering evidence presented at trial, the Court concludes that this factor is neutral. Defendants' incoming mail policy limits an important avenue of communicating art, but inmates retain alternative avenues, including sending art within the contents of the mailing itself or alternative mailing mediums such as postcards.

    c.   Effects on staff, inmates, and resources

The third <u>Turner</u> factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." <u>Turner</u>, 482 U.S. at 90. According to <u>Turner</u>, "courts should be particularly deferential to the informed discretion of corrections officials" when accommodating a constitutional right that will have "have a significant 'ripple effect' on fellow inmates or on prison staff." <u>Id.</u>

In <u>Turner</u>, the Court found that allowing certain inmate-to-inmate correspondence could "be exercised only at the cost of significantly less liberty and safety" for inmates and staff generally and, therefore, the court upheld certain restrictions on such correspondence. <u>Id.</u> at 92–93. This factor often weighs heavily when courts consider mail policies that restrict potentially disruptive content, such as depictions or descriptions of violence, escape, or criminal activity, sexually-explicit materials, and role-playing games, <u>see, e.g.,</u> <u>Frost,</u> 197 F.3d at 351–52; <u>Bahrampour v. Lampert</u>, 356 F.3d 969 (9th Cir. 2004), or where the challenged regulation saves the prison substantial resources, <u>see, e.g.,</u> <u>Overton v. Bazzetta</u>, 539 U.S. 126, 135 (2003).

Here, accommodating envelopes with drawings on the front of the envelopes is unlikely to have a "significant ripple effect" on inmates and staff. Defendants present no evidence showing that art placed on the outside of the envelope poses a greater risk than the same art

placed on the inside of the envelope and no evidence showing the effects envelope art has on staff or prisoners. Because no inmates see or handle mail until it is delivered to them, in their cell, there is no difference in the number of people who will see art on the front of the envelope from those who would see that same art on the inside or on the back. In addition, as explained above, Defendants present no evidence showing that the time or money saved by unconditionally rejecting all art on the front of envelopes is anything more than *de minimis*. Thus, the third Turner factor suggests that the incoming mail policy is not rationally related to legitimate penological goals.

d.   Easy and Obvious Alternatives

The final Turner factor requires the court to "consider 'whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.'" Morrison, 261 F.3d at 905 (internal quotation omitted). If a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Turner, 482 U.S. at 91.

Here, several obvious, easy alternatives exist. For example, ODOC could prohibit artwork on envelopes only if it interfered with mailroom staff members' ability to see the sender's and recipient's addresses. Or a policy could prescribe a certain portion of the envelope that must be left blank in order to accommodate mailroom staff members' needs to write the bunk number on the envelope. Furthermore, witnesses at trial discussed an impending technological improvement in the mailroom, whereby staff members will print labels for incoming mail instead of handwriting inmates' housing location. These labels may obviate some of the need for extra blank space on an envelope. This fourth factor favors Plaintiff.

21- FINDINGS OF FACT AND CONCLUSIONS OF LAW

e.  Summary of <u>Turner</u> Factors

In sum, the Court finds that, with regard to the four <u>Turner</u> factors, three of the four favor Plaintiff and one is neutral. The incoming mail policy blocks a narrowly defined form of expression—artwork on the front of envelopes—at too great an expense to the First Amendment rights of inmates and their correspondents. Plaintiff has thus proven by a preponderance of the evidence that Defendants violated his First Amendment rights.

III.    Injunctive Relief

The parties stipulated that, for the purpose of ordering injunctive relief, Ms. Raths and Colette Peters, current director of ODOC, are proper defendants in their official capacities. <u>See</u> Pre-Trial Order, [166]. Ms. Raths and Ms. Peters will be responsible for implementing and administering any injunctive relief with regard to ODOC's mail policies that may be ordered by the Court in this case. <u>Id.</u>

To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" <u>Id.</u> Where, as here, a plaintiff seeks an injunction against a state or local government agency, "federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." <u>Rizzo v. Goode</u>, 423 U.S. 362, 378 (1976) (internal quotation marks and citation omitted).

22- FINDINGS OF FACT AND CONCLUSIONS OF LAW

a.  Irreparable injury

Plaintiff has demonstrated irreparable harm because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Assoc. Gen. Contractors 1091 of Cal., Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1412 (9th Cir. 1991) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (internal quotation marks, citation, and alterations omitted)).

b.  Inadequacy of damages

In cases, like this one, that involve constitutional violations, this factor merges with the first factor. See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting Nelson v. Nat'l Aeronautics & Space Admin., 530 F.3d 865, 872 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.").

Because Plaintiff has shown that Defendants violated the First Amendment, and because the loss of First Amendment freedom constitutes irreparable harm, Plaintiff has demonstrated that monetary damages are inadequate.

c.  Balance of equities

The third factor requires the court to balance the equities. "In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." Stormans, 586 F.3d at 1138 (internal quotation marks, citation, and alteration omitted). The party seeking a permanent injunction "must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation." United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953).

Plaintiff has established that ODOC's incoming mail policy burdens his First Amendment rights, as well as the First Amendment rights of other inmates and their correspondents. Defendants face the possibility of spending a minimal amount of additional time each day looking more closely at envelopes in order to read the recipient's address. The constitutional hardship is far greater than the insignificant potential impact on Defendants' time and resources.

At trial, Ms. Raths testified that there are no current plans to change ODOC's incoming mail policy as to what is allowed on the front of envelopes. There has been no indication from any of the parties that ODOC will change its policy absent a court-ordered permanent injunction. Therefore, the Court concludes that the balance of equities tips in favor of granting a permanent injunction.

d.   Public interest

"The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 974 (9th Cir. 2002). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." Stormans, Inc., 586 F.3d at 1138–39 (internal quotation marks, citation, and alteration omitted). Here, however, the public interest favors entering a permanent injunction.

As this case deals with ODOC's incoming mail policy, it affects all members of the public who wish to communicate with inmates. A permanent injunction enjoining Defendants from enforcing a blanket ban on artwork on the front of envelopes will permit inmates and non-party members of the public to more easily and effectively communicate with each other by mail.

No envelope will be rejected solely because it has artwork on it, which will enable mail to reach inmates more quickly. The parties have not suggested that a permanent injunction will affect any other non-parties.

     e.   Scope of injunction

     After considering each of the four factors set forth by the Supreme Court in <u>eBay</u>, the Court concludes that a permanent injunction enjoining the incoming mail policy is warranted. Before issuing a permanent injunction, however, the Court must consider the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. The PLRA provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a). An "injunction employs the least intrusive means necessary when it heels close to the identified violation, and is not overly intrusive and unworkable and would not require for its enforcement the continuous supervision by the federal court over the conduct of state officers." <u>Clement v. Cal. Dep't of Corr.</u>, 364 F.3d 1148, 1153 (9th Cir. 2004) (internal quotation marks, citations, and alterations omitted).

     As described in the Conclusion below, the Court will issue a permanent injunction enjoining Defendants from rejecting or otherwise prohibiting incoming mail due to artwork on the front of the envelope, unless the art is found to violate other ODOC rules, such as those against violence. The Court will also require ODOC to provide notice to inmates, informing them that they are permitted to receive envelopes with artwork on them, as long as the artwork complies with other applicable ODOC rules. The injunction will address only the incoming

25- FINDINGS OF FACT AND CONCLUSIONS OF LAW

inmate mail policy and does not intrude on any other aspect of ODOC's administration. The injunction will not provide for ongoing Court supervision and will not require Defendants to submit compliance reports, institute trainings, or submit revised policies to the Court for review. The Court finds, therefore, that such an injunction would be narrowly drawn, extend no further than necessary to correct the First Amendment violations, and is the least intrusive means necessary to correct the violation of the federal right. See id. (upholding district court injunction where injunction did not require court supervision and was only broad enough to enjoin the unconstitutional policy); see also, Prison Legal News v. Columbia Cnty., 942 F. Supp. 2d 1068, 1090-92 (D. Or. 2013).

IV.    Declaratory Judgment

The Court also grants Plaintiff a declaratory judgment that ODOC's policy violated his First Amendment rights. The Declaratory Judgment Act, 28 U.S.C. § 2201, allows individuals to seek a declaration of the constitutionality of a disputed governmental action. See Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 71 n. 15 (1978). To issue a declaration, the Court must address two conditions. "First, the court must inquire whether there is a case of actual controversy within its jurisdiction." Am. States Ins. Co. v. Kearns, 15 F.3d 142, 143 (9th Cir. 1994). Second, "the court must decide whether to exercise that jurisdiction. The statute gives discretion to courts in deciding whether to entertain declaratory judgments[.]" Id. at 143–44.

The parties agree that Ms. Raths and Ms. Peters, in their official capacities, are properly named as defendants as to declaratory relief. However, Defendants argue that Mr. Premo and Ms. Dodson are not liable to Plaintiff because they did not personally participate in the violation of his constitutional rights when they reviewed and denied his request for administrative review of his rejected envelope.

26- FINDINGS OF FACT AND CONCLUSIONS OF LAW

To establish a Section 1983 claim against an individual defendant, a plaintiff must establish personal participation by the defendant in the alleged constitutional deprivation. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). A supervisor may be liable based on his or her personal involvement in the alleged deprivation, or if there is a sufficient causal connection between the supervisor's alleged wrongful conduct and the alleged deprivation, Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989), but a "supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), citing Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680–81 (9th Cir. 1984).

Defendants argue that Section 1983 liability may not be based merely on a plaintiff's dissatisfaction with the administrative process or a decision on appeal. Defendants cite cases from the Ninth Circuit that establish that there is not a "separate constitutional entitlement to a specific prison grievance procedure." Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003); see also Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988).

However, Plaintiff is not merely dissatisfied with the administrative process. Plaintiff alleges that Mr. Premo and Ms. Dodson knew of the violation of his constitutional rights and failed to act. The evidence shows that Mr. Premo and Ms. Dodson were aware of the mailroom staff members' conduct in rejecting Plaintiff's letter. Both Mr. Premo and Ms. Dodson rejected Plaintiff's attempt to appeal based on the unconstitutional incoming mail rule. Pl.'s Ex. 5, 7. Mr. Premo and Ms. Dodson, as the Superintendent of OSP and the OSP Grievance Coordinator's supervisor, respectively, could have acted to prevent the violation of Plaintiff's rights. Therefore,

the evidence shows that Mr. Premo and Ms. Dodson's denial of Plaintiff's appeal constituted a direct violation of his constitutional rights.

### CONCLUSION

Defendants violated Plaintiff's First Amendment rights. Plaintiff is entitled to declaratory judgment and a permanent injunction enjoining Defendants from rejecting or otherwise prohibiting incoming mail for containing artwork on the front of envelopes. Plaintiff is also entitled to an order requiring Defendants to inform inmates that they are permitted to receive letters with artwork on the front of envelopes.

Plaintiff shall prepare a judgment in accordance with these Findings of Fact and Conclusions of Law. After conferring with Defendants, Plaintiff shall submit the proposed judgment to the Court for review within 30 days of the date below. If the parties cannot agree on a judgment, Plaintiff shall notify the Court, which will then schedule a telephone conference with counsel.

IT IS SO ORDERED.

Dated this _30_ day of ___March___, 2015.


_____
MARCO A. HERNÁNDEZ
United States District Judge